[No. B147471. Second Dist., Div. Seven. Mar. 21, 2002.]

ANDREW WANG et al., Plaintiffs and Appellants, v.
MASSEY CHEVROLET, Defendant and Respondent.

## COUNSEL

Robert F. Brennan and Robert A. Wiener for Plaintiffs and Appellants.

Callahan, McCune & Willis and Toni Kern for Defendant and Respondent.

## OPINION

**LILLIE, P. J.**—In this action alleging, inter alia, fraud in the inducement of an automobile lease, plaintiffs appeal from summary judgment granted in favor of defendant Massey Chevrolet (Massey) on their complaint for damages for fraud and violations of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), and for injunctive relief for unfair competition under Business and Professions Code section 17200. The principal issue on this appeal is whether the trial court properly determined that plaintiffs' claims were barred by the parol evidence rule.

FACTUAL AND PROCEDURAL BACKGROUND

In October 1999, plaintiffs filed the instant action. The first amended complaint (complaint) contains three causes of action: (1) violation of the Consumers Legal Remedies Act, including Civil Code section 1770, subdivision (a)(13) and (14);[1] (2) fraud, and (3) injunctive relief for unfair competition under Business and Professions Code section 17200.

The complaint arises from events in August 1997, when plaintiffs allegedly negotiated with Massey to purchase a Chevrolet Suburban for a total of $35,213; plaintiffs wanted to purchase the vehicle by making an immediate down payment of $20,000 and then financing the remaining balance of $15,213 with a short term loan that they wanted to pay off in late September or October 1997, when a CD would mature. Instead, Massey "schemed to bait plaintiffs with an acceptable discounted car price on a retail deal and then switched them to a lease. Dealer [Massey] did this by using 'buying terms' instead of 'lease terms' and deceptive mathematics . . . to deliberately confuse plaintiffs into believing a lease was just like a purchase." Plaintiffs alleged that through this ploy, Massey "was able to ultimately obtain plaintiffs' signature on a lease agreement by which terms they would have to make 60 payments totaling $22,437, and if plaintiffs wished to purchase at the end of the lease they would have to pay an additional $15,310. This plus the $20,000 check plaintiffs gave as a down payment brought the cost of the vehicle to $57,747. . . . The difference between plaintiffs initial negotiated purchase price [of $35,213] and the lease they ended up with is $22,534 . . . . So, in effect, by being switched into a lease plaintiffs were being defrauded by not less than $22,534." Plaintiffs also alleged that because a lease was more profitable, Massey would receive on such leases kickbacks or rebates from General Motors Acceptance Corporation (GMAC), named as a codefendant in the complaint, but not a party to this appeal.

The complaint contains the following detailed factual allegations as to the negotiations and representations made by Massey: On the morning of August 17, 1997, plaintiffs saw a full-page advertisement by Massey in the newspaper, which stated that hundreds of trucks and vans were on sale, including custom Suburbans and Tahoes, with "$7,000 off MSRP." About 10:00 a.m.,

---

[1] Civil Code section 1770 provides in pertinent part: "(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: [¶] . . . [¶] (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions. [¶] (14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

plaintiffs arrived at Massey and were shown some vehicles by Massey's sales person, Mr. Sib Ghani (Ghani); plaintiffs gave the advertisement to Ghani and told him that they would consider buying one of the trucks if the selling price was really $7,000 off the window sticker price; Ghani took the advertisement back to the sales office to ask his boss and returned to tell the Wangs that they could make a deal with $7,000 off the window sticker if they would buy a truck that day.

After the Wangs test-drove a Suburban they liked, they began negotiations with both a sales and finance person from Massey; plaintiffs told them repeatedly that they intended to "own the suburban free and clear," that they were prepared to make a down payment of $20,000 and they wanted to take out a short-term loan for the balance because they planned to pay the balance off in two or three months when their CD matured; if a short-term loan could not be obtained through the dealer, plaintiffs planned to get a short-term loan through their own bank and pay off the Suburban in a few days. Plaintiffs also told Massey's finance manager, Mr. Sutterman (Sutterman), that they were GM credit card members and had earned the amount of $845.23, which they wanted to apply to the purchase of the Suburban; although Sutterman represented that he had applied for the rebate, which the GM card program would mail to the Wangs, Sutterman never applied for the rebate on their behalf; eventually a person with the GM card program had to apply for it on the Wangs' behalf.

Massey required the plaintiffs to deposit their check for $20,000 during the negotiations. After several hours of negotiations, Massey worked out something totally different than what they wanted, and plaintiffs were "extremely stressed and hungry and repeatedly asked [Massey] to return the check for $20,000 and their GM credit card and they would apply for the short-term loan themselves"; Massey ignored their requests, kept their check and credit card, and told them they should not worry because they could work out the loan so they could drive home with the new Suburban that day. Again and again, two of Massey's sales people and two of the finance people took turns trying to convince them to sign a lease contract they had prepared instead of a short-term financing agreement; plaintiffs insisted that they wanted to purchase the vehicle and pay off the balance of $15,213 in October 1997. Finally, around 4:00 p.m., about six hours after plaintiffs had arrived, Sutterman presented them with a Lendco Financial Services lease agreement listing the following terms: a capitalized cost of $39,762.55; a term of 60 months; lease end value of $15,200; and a monthly payment plus tax of $425.80.

Plaintiffs asked why the capitalized amount changed from $35,213 as they had originally negotiated; Massey responded that "The amount varied for

loan process purposes." When plaintiffs asked to change the number of months from 60 to just two, Massey responded, "We don't need to change the number of months and you can pay it off in two months or at any time." When plaintiffs asked if there was a penalty for early payoff in October 1997, Massey told them that "There is no early payoff penalty," and the payoff would be $15,213 in October of 1997, although Massey was uncertain whether plaintiffs would have to pay taxes on the payoff. In response to plaintiffs' questions, Massey told plaintiffs that there were no contractual differences between a loan and the lease. With the foregoing assurances and explanations, plaintiffs signed the Lendco lease agreement in Sutterman's office. Under the Lendco lease, the "Estimated Wholesale Value of Leased Vehicle at Lease End" was listed as $15,200.

Two days later, on August 19, Ghani called plaintiffs and told them that Massey had found a better loan company which gave them a lower monthly payment; Massey wanted them to sign a new lease agreement. On August 23, 1997, Sutterman presented plaintiffs with a lease titled "GMAC Lease Agreement"; the GMAC lease listed the lessor as Massey. The GMAC lease provided the following terms: a capitalized cost of $41,762.55; a term of 60 months; a lease end price of $15,310; and a monthly payment with tax of $373.95. Plaintiffs again asked questions as to why the price was not $35,213, as they had negotiated, why the term could not be changed to just two months, and if there was a penalty for early payoff. Sutterman replied that the price of the car varied for loan process purposes, there was no need to change the number of months because plaintiffs could pay off the loan at any time with no penalty, and the payoff would be $15,213 minus any rebate from use of the GM credit card, which would bring the payoff to about $14,400. With the foregoing explanations and assurances, plaintiffs signed the GMAC lease contract. At the same time, they also executed a document rescinding the Lendco lease; the rescission agreement stated that the purpose of the rescission was "Lowered payments; otherwise the same."

After plaintiffs' CD matured, they pulled the money from their account and on October 3, 1997, called GMAC and asked them about the early payoff for their loan; GMAC told them that the payoff amount would be $24,512.89 plus tax. Plaintiffs then called Sutterman who referred them to Massey's agent who had prepared the lease contracts, Jeff Myers (Myers). After four attempts to reach Myers, he told plaintiffs that the lease was not supposed to be closed in two months, that the lease monthly payment would give them a better income tax shelter and write off, and "You have to pay what you signed."

Plaintiffs called the GM customer satisfaction procedure line on October 7, 1997, to file a complaint; they also called Massey dozens of times in an

effort to resolve the matter; the matter was not resolved, and plaintiffs were told not to get outside help, that Massey wanted to discuss the matter with their legal department and get back to them. Sometime in late October 1997, Sutterman told plaintiffs that they could not resolve the matter because he could not get approval from his boss and there was nothing he could do.

In their claim for violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), plaintiffs alleged that Massey deliberately confused, cheated, and took advantage of them by using deceptive mathematics, lying about the terms of the leases, and using "buying terms" instead of "lease terms" in their negotiations; Massey deliberately confused plaintiffs into believing a lease was just like a purchase and based on Massey's misrepresentations, plaintiffs entered into the leases. Plaintiffs allege Massey violated Civil Code section 1770, subdivision (a)(1), (5), (9), (13), (14), (16), (17), (19), and (20).

A second cause of action for damages for common law fraud alleged that Massey made intentional misrepresentations about the GMAC lease and suppressed information, causing them to suffer general and special damage. A third cause of action for injunctive relief under Business and Professions Code section 17200 et seq., alleged that Massey engaged in unlawful business practices by misrepresenting the lease terms and switching them into a lease when they desired to purchase the Suburban; they sought an injunction to prevent Massey from continuing to engage in the unlawful conduct and to require Massey "to disgorge the profits they have wrongfully obtained through the use of these practices."

Massey moved for summary judgment or, in the alternative, for summary adjudication as to each cause of action. Massey argued that all claims were barred by the parol evidence rule, which precluded a fraud claim based on oral representations which were contrary to the written provisions of the parties' lease contracts. Massey also argued that because the lease terms were contrary to the alleged oral representations, it was unreasonable as a matter of law for plaintiffs to have relied on the alleged contrary statements, so they could not establish the element of justifiable reliance required for a fraud claim. Massey also argued that "plaintiffs cannot produce any evidence Massey intended to defraud them."

With respect to the claims for violations of the Consumers Legal Remedies Act, Massey contended that the allegations regarding violations of Civil Code section 1770, subdivision (a)(13), (14), (16), and (17), were also barred by the parol evidence rule. Massey also argued that the third cause of action fails for the same reasons as the fraud claim fails. As to all counts,

Massey contended that plaintiffs ratified the alleged fraud by retaining the Suburban and making payments for over two years before commencing the instant action.

Massey's separate statement of facts was based primarily on portions of the deposition testimony of Andrew Wang and the provisions of the leases and related documents. Massey pointed out that this evidence establishes that the plaintiffs are mentally competent adults who have lived and worked in the United States for nearly 25 years; Andrew Wang is fluent in English and worked for several years as a residential real estate broker; Andrew Wang maintains his records and personal notes in English and is proficient in writing English; the Wangs previously leased two other vehicles, a motor home in 1978 and a Cadillac in 1988; in each case, they retained the vehicles until the conclusion of the lease and then purchased the vehicle. The Wangs signed or initialed the Lendco lease in at least 10 different places; the lease contains the word "lease" dozens of times, and Andrew Wang knew that the document he was signing was a lease. Contemporaneously with the execution of the Lendco lease, the Wangs also signed a "Lease Acknowledgement" stating that "I understand that I am leasing a vehicle; terms and conditions of the lease have been explained to me in full." With respect to the GMAC lease, the Wangs also were aware that they were signing a lease.

Massey also provided evidence that the Wangs have been making all monthly payments as required under the GMAC lease, and after initiating this action, they continued to use the Suburban, driving it more than 38,000 miles.

In opposition to the motion, the Wangs argued that the parol evidence rule, and cases cited by Massey, were inapposite because they are not trying to rescind or nullify the GMAC lease, or seeking damages for breach of lease; rather, they are seeking tort damages for fraud which occurred in the inducement of the leases. Plaintiffs also offered the deposition testimony of Andrew Wang establishing that he did not understand the specific terms of the leases, and asked Sutterman specific questions about the terms of the leases; the Wangs accepted Sutterman's explanations and assurances about the lease terms. Plaintiffs argued that the parol evidence rule did not apply here where the lease terms were difficult to understand and where the plaintiffs were reasonable in relying on Massey's explanations of the leases. Plaintiffs pointed out that they never saw or read any terms of the lease regarding a penalty because they reasonably believed the false representations of Massey's agents.

According to Andrew Wang's deposition testimony, he did not understand the term "capital cost," and Sutterman told him something that he did not

understand and also that the figure in the lease was for a "loan process purpose." When Andrew Wang was presented with the GMAC lease and saw the term as 60 months, he was going to write on the lease to change it to two or three months; Sutterman stopped him, and told him he did not need to change it, and he could pay it off anytime without penalty. Andrew Wang was satisfied with Sutterman's explanation and signed the lease. Andrew Wang also submitted in opposition to the summary judgment motion a declaration in which he reiterated many of the same facts alleged in the complaint and also in his deposition testimony; he also detailed his attempts to informally resolve the matter with Massey and GMAC.

With respect to the issue of Massey's fraudulent intent, the Wangs contended that there was sufficient circumstantial evidence of such intent to create a triable issue of fact. As to the claims for violations of the Consumers Legal Remedies Act and Business and Professions Code section 17200, plaintiffs argued that the parol evidence rule did not apply to such claims.

In reply to the opposition, Massey made evidentiary objections to portions of Andrew Wang's declaration regarding Sutterman's alleged misrepresentations; the objections were based on the parol evidence rule, best evidence rule and hearsay. Although the portions of the declaration to which Massey objected were consistent with, and duplicative of, much of Wang's deposition testimony, Massey did not object to any portion of Andrew Wang's deposition testimony.

After hearing, the court took the matter under submission; on January 8, 2001, the court issued an order granting the motion for summary judgment and in the alternative finding that Massey was entitled to summary adjudication as to each cause of action of the complaint. The January 8, 2001, order stated that the fraud claim was barred "because there was no written misrepresentation and plaintiffs are precluded from relying upon any alleged contrary oral representation as a matter of law. . . . [¶] The fraud exception to the parol evidence rule has no application because it applies only to promises independent of the main agreement and does not apply where the alleged false promises directly contradicted the agreement itself. [Citation.] [¶] The lease documents are complete. Parol evidence excludes extrinsic evidence which contradicts the written agreements. Here, the lease contains an integration clause which was initialed by plaintiffs . . . . As a matter of law, this court determines that the lease documents are fully integrated. [Citation.] [¶] Plaintiffs' claims of ignorance will not help them. The lease specifically states [in paragraph 30]: 'What You Owe at Early Termination.' [Citation.] That paragraph explains the formula for the calculation of the payment that would be due. A party is bound by the provisions in an

agreement which he signs even though he has not read them and signs unaware of their existence. [Citation.] Ergo, a party's negligence in not reading an agreement as a matter of law cannot be a mutual or unilateral mistake sufficient to reform the agreement. [Citation.]"[2]

The court also ruled that the first claim for violation of the Consumers Legal Remedies Act "is without merit because plaintiffs cannot show that they did not receive all that was promised under the lease." The court also found that there was no evidence that Massey received a "kickback" on the lease. Finally, the court found the third cause of action "fails for the same reasons as the first two causes of action fail."

Plaintiffs filed timely notice of appeal from the judgment entered in Massey's favor. ■ In reviewing that judgment, we apply the following principles: Summary judgment is properly granted if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (*O'Byrne v. Santa Monica-UCLA Medical Center* (2001) 94 Cal.App.4th 797, 804 [114 Cal.Rptr.2d 575].) We review the decision granting summary judgment de novo; we review the ruling, not the trial court's stated reasons. (*Travelers Casualty & Surety Co. v. American Equity Ins. Co.* (2001) 93 Cal.App.4th 1142, 1148-1149 [113 Cal.Rptr.2d 613].) The moving party must establish its entitlement to judgment as a matter of law. (*Id.* at p. 1148.) Once the defendant has met this burden, the plaintiff must show that a triable issue of fact exists as to the cause of action or the defense thereto. (*O'Byrne v. Santa Monica-UCLA Medical Center, supra*, 94 Cal.App.4th at p. 804.)

DISCUSSION

A. *Cause of Action for Violations of Civil Code section 1770.*

■ The Wangs' claim for violations of the Consumers Legal Remedies Act alleges numerous statutory violations, including violation of Civil Code section 1770, subdivision (a)(14) (hereinafter section 1770). (See fn. 1, *ante.*) As to this particular statutory violation, Massey's summary judgment motion was predicated on the theory that the same defenses applicable to a common law fraud cause of action are applicable to a statutory claim under section 1770, subdivision (a)(14), and the parol evidence rule bars the

---

[2]Contrary to appellants' contentions, there is no indication that the trial court sustained Massey's evidentiary objections by excluding any evidence, or "applied the parol evidence rule to exclude all of the Wangs' evidence." Our record indicates that the trial court simply applied the parol evidence rule as a rule of substantive law in determining the legal significance of the evidence in the record.

statutory claim. However, Massey has not cited any pertinent authority to support the proposition that the parol evidence rule bars a plaintiff's statutory claim under section 1770, subdivision (a)(14), and for reasons explained below, we conclude that such rule is inapplicable to such a claim.[3]

We are not aware of any case which has addressed the issue of whether the parol evidence rule constitutes a bar or defense to a claim based on violation of section 1770, subdivision (a)(14). Nevertheless, established principles of statutory construction indicate that the parol evidence rule is inapplicable.

■    The interpretation of a statute is a question of law and subject to de novo review on appeal. (*Hill v. City of Clovis* (2000) 80 Cal.App.4th 438, 446 [94 Cal.Rptr.2d 901].)    ■    In ascertaining the intent of the Legislature so as to effectuate the purpose of the law (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 338 [33 Cal.Rptr.2d 109, 878 P.2d 1321]), we consider the statutory scheme of which the provision is a part (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978]); we give the words of the statute a plain and commonsense meaning, looking to the entire substance of the statute in order to determine the scope and purpose of the provision. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 578 [110 Cal.Rptr.2d 809, 28 P.3d 860].) We avoid any construction that would produce absurd consequences. (*Ibid.*) Further,

---

[3]Massey's arguments below and on appeal assume, without citation of any authority, that the elements of, and defenses to, a claim under section 1770, subdivision (a)(14), are the same as those of a common law fraud cause of action. For purposes of this appeal, we need only address the issue of the applicability of the parol evidence rule to this statutory claim. We do not address the other elements of the statutory cause of action, and do not intend to suggest that its elements are the same as those for a common law fraud or intentional misrepresentation cause of action.

"Code of Civil Procedure section 1856 sets forth the parol evidence rule. Subdivision (a) of that section provides: 'Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.' . . . [¶] . . . [¶] . . . [T]he 'fraud exception' to the parol evidence rule [is] contained in subdivision (g) of section 1856, which provides in relevant part: This section does not exclude other evidence . . . to establish illegality or fraud.' " (*Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 418-419 [264 Cal.Rptr. 779], fns. and italics omitted.) "There is a line of cases . . . emanating from *Bank of America etc. Assn. v. Pendergrass* [(1935)] 4 Cal.2d 258 [48 P.2d 659], which stands for the proposition that parol evidence to show fraud is inadmissible to show an oral promise directly at variance with a term of the contract." (*Munchow v. Kraszewski* (1976) 56 Cal.App.3d 831, 836 [128 Cal.Rptr. 762], fn. omitted.) Thus, the "fraud exception" to the parol evidence rule is not applicable unless the false promise is independent of, or consistent with, the written instrument. (*Continental Airlines, Inc. v. McDonnell Douglas Corp., supra*, 216 Cal.App.3d at p. 419.)

we should not read statutes to omit expressed language or include omitted language. (*Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 894 [113 Cal.Rptr.2d 483].)

■ "The Consumers Legal Remedies Act, enacted in 1970, 'established a nonexclusive statutory remedy for "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer. . . ." [Citation.]' " (*Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139, 1154 [67 Cal.Rptr.2d 543, 82 A.L.R.5th 781].) "The self-declared purposes of the act are 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.' (Civ. Code, § 1760 . . . .)" (*Hogya v. Superior Court* (1977) 75 Cal.App.3d 122, 135 [142 Cal.Rptr. 325].) The Consumers Legal Remedies Act is supplemental to remedies available under other statutory and case law; moreover, actions brought under the act are governed exclusively by its own provisions. (*Ibid.*; see also Civ. Code, § 1752.)

Any consumer who suffers any damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by section 1770 may bring an action against that person to recover actual damages, injunctive relief, restitution of property, punitive damages, and any other relief the court deems proper. (Civ. Code, § 1780, subd. (a).)

"As it is unlawful to engage in any of the deceptive business practices enumerated in section 1770, consumers have a corresponding legal right not to be subjected thereto. Accordingly, we interpret broadly the requirement of section 1780 that a consumer 'suffer[] any damage' to include the infringement of any legal right as defined by section 1770." (*Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 593 [200 Cal.Rptr. 38, 676 P.2d 1060].) Thus, not only are the provisions of the act to be liberally construed (Civ. Code, § 1760), but "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." (Civ. Code, § 1751.)

The act provides a broad definition of "transaction" as "an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." (Civ. Code, § 1761, subd. (e).)

■ In light of the requirement that the act be construed liberally, and the broad definition of "transaction," the only reasonable interpretation of

section 1770, subdivision (a)(14), is that it includes oral misrepresentations or promises concerning the rights, remedies, or obligations under a written contract, like those misrepresentations and promises alleged by the Wangs herein. By its very language, subdivision (a)(14) of section 1770 contemplates the existence of collateral oral promises, representations or agreements which may be inconsistent with the rights, remedies, or obligations set out in a written contract; the statute makes such misrepresentations unlawful. In light of the unlawful acts set out in subdivision (a)(14) of section 1770, the Legislature clearly intended to repudiate any purported bar or defense based on the parol evidence doctrine.

To permit the bar or defense of the parol evidence rule under the instant facts is to deem the Legislature to have engaged in an absurd task: the Legislature would have made a practice unlawful but would have precluded a plaintiff from ever establishing it by application of the parol evidence rule. Further, permitting a parol evidence bar or defense under the instant circumstances would be tantamount to construing the written contract as constituting essentially a waiver of the protections of the act, which waiver is contrary to public policy. Massey's ratification argument, made in the trial court but not reiterated here, is also without merit as it would sanction a waiver defense, which waiver is prohibited under Civil Code section 1751.

Thus, subdivision (a)(14) of section 1770 is an apparent response of the Legislature to the deficiencies in, or the difficulty of proving, common law fraud under the *Pendergrass* rule. (See fn. 3, *ante*.) Moreover, our interpretation of section 1770 is consistent with Code of Civil Procedure section 1856, subdivision (g), which expressly permits evidence "to establish illegality or fraud." For all of the foregoing reasons, we conclude that the parol evidence rule does not constitute a defense or bar to the Wangs' first cause of action in the complaint. Massey's motion did not raise any other specific ground as a basis for summary judgment on the claim for a violation of section 1770, subdivision (a)(14). Massey failed to establish it was entitled to prevail on all theories of liability (i.e., violations) reflected in this cause of action.[4] Accordingly, the trial court's decision as to the first cause of action was erroneous, and we need not discuss the other alleged violations of section 1770, subdivision (a).

[4]Massey's motion did not raise the statutory defense set out in Civil Code section 1784, which provides: "No award of damages may be given in any action based on a method, act or practice declared to be unlawful by Section 1770 if the person alleged to have employed or committed such method, act, or practice (a) proves that such violation was not intentional and resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid any such error and (b) makes an appropriate correction, repair or replacement or other remedy of the goods and services according to the provisions of subdivisions (b) and (c) of Section 1782."

B. *Violations of Business and Professions Code section 17200 et seq.*

██ The third cause of action in the complaint was premised on violations of Business and Professions Code section 17200. Massey's ground for summary judgment as to this claim was similarly based on the parol evidence rule, and on the premise that the defenses available to a common law fraud claim are applicable to a claim under Business and Professions Code section 17200. The latter contention is without merit.

Section 17200 of the Business and Professions Code "prohibits unlawful, unfair and fraudulent business practices and unfair, deceptive, untrue and misleading advertising. . . . [Section 17500] makes it unlawful for any person or entity to induce someone to enter a contract by disseminating untrue or misleading information." (*Solorzano v. Superior Court* (1992) 10 Cal.App.4th 1135, 1146 [13 Cal.Rptr.2d 161].)

██ "To state a claim under section 17200, a plaintiff 'need not plead and prove the elements of a tort. Instead, one need only show that "members of the public are likely to be deceived." ' " (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877 [85 Cal.Rptr.2d 301].) The practices prohibited by Business and Professions Code section 17200 are " ' "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] As our Supreme Court put it, section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq." ' " (*South Bay Chevrolet v. General Motors Acceptance Corp., supra,* 72 Cal.App.4th at p. 880.) Moreover, the term "fraudulent" as used in section 17200 does not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived. (*South Bay Chevrolet, supra,* at p. 888.) Accordingly, a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. (*South Bay Chevrolet, supra,* at p. 888.)

██ Inasmuch as the Wangs' claim for violation of Business and Professions Code section 17200 incorporates the allegations of a violation of section 1770, subdivision (a)(14), we conclude that the parol evidence rule does not bar their section 17200 claim for the same reasons set out in part I.A. above. Massey has not established it is entitled to summary judgment with respect to the claim for violation of Business and Professions Code section 17200.

## C. *Fraud Cause of Action.*

The second cause of action of the complaint is a damage action premised upon a common law fraud theory sounding in intentional misrepresentation. A plaintiff fraudulently induced to enter into a contract has the power to elect to affirm the contract and sue for damages resulting from the fraud; the plaintiff may recover "out-of-pocket" damages in addition to benefit-of-the-bargain damages. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645-646 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

The trial court's order granting the summary judgment motion did not discuss the element of justifiable reliance, and it can be inferred that the court rejected Massey's argument that the reliance element of fraud could not be satisfied as a matter of law. We conclude the trial court properly declined to base its decision on this ground. The court in *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Development Corp.* (1995) 32 Cal.App.4th 985 [38 Cal.Rptr.2d 783], rejected the proposition that "a contract clause which states that the parties relied only on representations contained in the contract establishes, as a matter of law, that a party claiming fraud did not reasonably rely on representations not contained in the con- tract. We hold that such a per se rule is inconsistent with California law and reverse the summary judgment." (*Id.* at p. 987.)

Thus, the fact that the GMAC lease may have contained an integration clause and the Wangs' purported "ignorance," or failure to read the lease, would in themselves not establish the lack of justifiable reliance on Sutter- man's oral representations.[5] Inasmuch as the bar of the parol evidence rule, and not the lack of justifiable reliance, was the basis for the court's decision, we proceed to discuss this rule. "The resolution of the issue of whether the [parol evidence] rule applies so as to exclude any collateral oral agreement is one of law to be determined by the court." (*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1001 [285 Cal.Rptr. 870].)

The theory underlying the Wangs' common law fraud claim for damages involves the affirmance of the lease contract, and not its rescission. "[T]he eminent Bernard E. Witkin opined in his treatise on evidence (2

---

[5]Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather then negligent. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239-1240 [44 Cal.Rptr.2d 352, 900 P.2d 601].) The issue is whether the person who claims reliance was justified in believing the representation in light of his own knowledge and experience (*id.* at p. 1240); whether reliance is justified is usually a question of fact and may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts. (*Id.* at p. 1239.)

Witkin, Cal. Evidence (3d ed. 1986) § 1000, pp. 946-947) that the [parol evidence] rule may be questioned today where a party seeks fraud damages, rather than merely attempting to avoid or nullify the main agreement. Mr. Witkin expressed that view because in 1985 [in *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18 [216 Cal.Rptr. 130, 702 P.2d 212]] the California Supreme Court reversed the long-standing and analogous rule that a tort action for damages could not be based on a false promise where the promise itself was unenforceable under the statute of frauds." (*Continental Airlines, Inc. v. McDonnell Douglas Corp., supra,* 216 Cal.App.3d at p. 421.) However, while the *Pendergrass* rule (see fn. 3, *ante*) "may be subject to criticism, and even questioned, it is still the law and we are bound by it." (*Continental Airlines, Inc., supra,* at p. 420.)

■ The application of the parol evidence rule has been characterized as having a two-part analysis: " '1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements [citation]; and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence?' " (*Banco Do Brasil, S.A. v. Latian, Inc., supra,* 234 Cal.App.3d at p. 1001.)

The fraud exception to the parol evidence rule (Code Civ. Proc., § 1856, subd. (g)), "does not apply to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible." (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1436 [7 Cal.Rptr.2d 718].) Under the *Pendergrass* rule, the fraud exception to the parol evidence rule does not apply where parol evidence is offered to show a fraudulent promise " 'directly at variance with the promise of the writing.' " (*Continental Airlines, Inc. v. McDonnell Douglas Corp., supra,* 216 Cal.App.3d at p. 419, italics omitted.)

■ Although we acknowledge some differences between the formulation of the general parol evidence rule by *Banco Do Brasil,* and the fraud exception to the rule as articulated by *Pendergrass* and *Continental Airlines,* we proceed to address the issue of whether the Lendco and GMAC leases are consistent with Sutterman's oral representations concerning the lease terms and the promise that the Wangs could purchase the vehicle in October 1997 by paying the sum of about $15,200 (Lendco lease) or $15,310 (GMAC lease).

Massey asserted below, with little if any discussion, that the oral representations contradicted paragraph 13 of the Lendco lease and paragraph 30

of the GMAC lease and therefore this case did not fall within the fraud exception to the parol evidence rule. On appeal, Massey only states, with no further analysis, that the oral agreements as to the transaction "cannot be reconciled with the provisions of the [GMAC] lease agreement."

A careful reading of the leases, however, indicates that the oral representations are not "directly at variance" with the terms of the Lendco lease; however, the oral representations are "directly at variance" with the terms of the GMAC lease.

The Lendco lease, in paragraph 13, provides in pertinent part: "At any time after I have given you 30 days prior written notice, I may terminate this Lease. At any time after I sign this Lease, you may terminate the Lease if it is in default . . . . [¶] Except as provided in paragraph 16 [dealing with vehicle damage, loss or danger], I agree that if I do not then purchase the leased vehicle, if I have that option, my payment liability upon early termination will be the sum of: [¶] A. A disposition fee of $495; plus [¶] B. Any monthly lease payments already due you which are unpaid . . . plus [¶] C. The amount, if any, by which the Adjusted Lease Balance as defined in paragraph 4 exceeds the finalized Value of the leased vehicle determined under paragraph 12; plus [¶] D. Any official fees and taxes imposed in connection with Lease termination . . . ."

Paragraph 4 provides in pertinent part that "The Adjusted Lease Balance will be equal to the sum of the Estimated Wholesale Value of Leased Vehicle at Lease End [$15,200] and the remaining unpaid monthly lease payments minus a credit for unearned lease charges calculated on the actuarial method. [¶] . . . Over the Lease term you will earn total lease charges equal to the product of paragraph 24(d) [average monthly lease charge of $263.53] and the number of months in the lease term. . . . When you calculate my early termination liability, you will deduct these unearned lease charges using the assumption that the termination occurs on the last day of the billing cycle in which termination occurs."

A reasonable interpretation of the foregoing provisions is that the Wangs would be entitled to terminate the Lendco lease at any time with 30 days written notice; if they purchased the vehicle upon such termination, the most they would have to pay would be the estimated wholesale value of leased vehicle at lease end, or $15,200. The latter payment, combined with the down payment of $20,000, is consistent with the oral representations made to the Wangs that they could purchase the vehicle for a total of $35,213 by paying $20,000 immediately and paying the remaining $15,213 in several

months. A reasonable interpretation of provisions A, B, C, and D in paragraph 13 is that this formula would apply only upon an early termination where the Wangs did not decide to purchase the leased vehicle. The language of the Lendco lease is thus reasonably susceptible to a meaning consistent with the oral agreement as alleged by the Wangs.

The terms of the GMAC lease, however, are entirely different than those in the Lendco lease.[6] Because the fraud cause of action appears to be predicated only on the GMAC lease, the trial court correctly could have granted summary adjudication as to this cause of action.

Paragraph 6 of the GMAC lease provides that the Wangs' first monthly payment is due when they signed the lease; the other 59 monthly payments are due on the 20th day of the month beginning in September 1997; if the number of monthly payments is more than one, "this Lease is scheduled to end 1 month after the last payment is due." Paragraph 23 of the GMAC lease provides: "This Lease is scheduled to end on the scheduled end date disclosed in Item [paragraph] 6." Paragraph 24 states: "You may terminate this Lease at any time before its scheduled end. If you are in default, or if the vehicle is stolen (and not recovered) or destroyed, we also may terminate this Lease. Early termination may require you to pay a substantial charge. (See Item 30.)" (Underscore in original.)

Paragraph 27 provides in pertinent part: "You have an option to purchase the vehicle only at the scheduled end of the Lease. See Item 11 for your purchase price." Paragraph 11 provides: "Price if you purchase at scheduled Lease end: $15,310, plus any related official fees and taxes." Paragraph 16 states: "The Termination Value is $15,200. We will use this value in Item 30 when we calculate the amount you owe at early termination."

Paragraph 29 is captioned, "What you owe at scheduled termination." Paragraph 29(a) provides: "IF YOU BUY THE VEHICLE: If you have paid the

---

[6]Thus, the claim in the rescission document that the reason for the rescission of the Lendco lease was for "lowered payments" is questionable.

We also question how the trial court could have even addressed the issue of the parol evidence rule in connection with the GMAC lease if the trial court had before it the same copy of the lease which is in our appellate appendix. The copy of the GMAC lease in the appendix on appeal is illegible and incomplete, with a portion of the left side of the document not having been copied at all and an apparent copier malfunction causing a dark horizontal line to obscure several complete lines of print across paragraph 30. Upon our request, counsel were asked to supply legible copies of both leases; although the copies submitted upon our request were much improved, other portions of the leases were now obscured by other apparent copying defects. As best as we can, we have pieced together the pertinent provisions of the GMAC lease from all of the copies provided.

vehicle purchase price and all required fees and taxes, and you have kept all of your agreements in this Lease, you will owe us nothing more."

In pertinent part, paragraph 30 provides: "WHAT YOU OWE AT EARLY TERMINATION. If this Lease terminates early, you will owe us the total of the amounts from A and B[7]: [¶] A. In general, you will owe us any unpaid Monthly Payments. We will give you a credit for any unearned Lease Charges and a credit if we sell the vehicle for more than its Termination Value (Item 16). We will use the Actuarial Method to figure unearned Lease Charges. . . . This general rule is subject to exceptions described in this Item 30. [¶] More specifically, you will owe us the amount from (a) or (b)[8]: [¶] (a) If the number of Monthly Payments (Item 3) is more than 1, you will owe us: (1) The Base Monthly Payment (Item 4(a)) times the number of payments not yet due, minus (2) Any unearned Lease Charges (see Item 4), figured by the Actuarial Method, minus (3) Any Surplus . . . on the sale of the vehicle, plus (4) If there is no Surplus, any Early Excess Mileage and Wear Charge . . . ."

The oral representations that the Wangs could terminate the GMAC lease early without any penalty and pay only $15,213 to purchase the vehicle appear to be "directly at variance" with the provisions of the GMAC lease. The lease clearly sets out in paragraph 24 that early termination may require the Wangs to pay a substantial charge and in paragraph 27 that they had an option to purchase the vehicle only at the scheduled end of the lease. The GMAC lease is simply not reasonably susceptible to an interpretation consistent with Massey's oral representations. The trial court properly ruled in the alternative that Massey was entitled to summary adjudication as to the common law fraud cause of action.

## DISPOSITION

The judgment is reversed and on remand the trial court is directed to vacate its prior order granting summary judgment, and to enter a new order denying the motion for summary judgment, denying summary adjudication as to the first and third causes of action of the first amended complaint, and granting summary adjudication as to the second cause of action of the first

---

[7]We do not set out the provisions of B., as this section deals with unpaid taxes and fees and amounts due if the Wangs have breached any agreements in the lease. There is no issue here concerning breach of the lease by the Wangs, and the provisions of 30 B. do not impact the analysis of whether the parol evidence rule bars the Wangs' fraud cause of action.

[8]We do not set out the provisions of (b), as the Lease is in the alternative, and (b) deals with the situation where the number of Monthly Payments is 1; in this lease, the number of monthly payments was listed as 60.

amended complaint sounding in common law fraud. Appellants are entitled to costs on appeal.

Woods, J., and Perluss, J., concurred.